# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

RANDO BETANCOURT BARCO, MICHEL
FUENTES LUIS, LUIS ALFONSO MEJIA
VELASQUEZ,

        Plaintiffs/Petitioners,

        v.                                  No. 2:20-cv-350-WJ-CG

COREY PRICE, in his official capacity as Director
of the El Paso ICE Field Office; DORA OROZCO, in
her official capacity as Warden of Otero County
Processing Center; MATTHEW T. ALBENCE, in his
official capacity as Deputy Director and Senior Official
Performing the Duties of the Director of the U.S.
Immigration & Customs Enforcement; CHAD WOLF,
in his official capacity as Acting Secretary, U.S.
Department of Homeland Security; WILLIAM P.
BARR, in his official capacity as Attorney General, U.S.
Department of Justice; and U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,

        Defendants/Respondents.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

**THIS MATTER** comes before the Court on Plaintiffs' Motion for a Temporary Restraining Order [Doc. 3], filed April 20, 2020. Plaintiffs are noncitizen detainees who are in the process of being removed from the United States. They are detained at the Otero County Processing Center ("Otero"). Plaintiffs request that the Court issue a temporary restraining order releasing them from Otero because they have medical conditions that make them vulnerable to serious illness or death should they contract Coronavirus Disease 2019 (COVID-19) and that there are no adequate measures that can ensure they avoid exposure to COVID-19 at Otero.

Plaintiffs are seeking relief under 28 U.S.C. § 2241 as a habeas corpus petition and 28

U.S.C. § 1331 as an independent cause of action for injunctive relief under the Fifth Amendment's Due Process Clause. The Court has reviewed the briefing, exhibits, and applicable law and finds that Plaintiffs have not met their heightened burden to demonstrate that the extraordinary remedy of a temporary restraining order is warranted. For the reasons explained in this Memorandum Opinion and Order, the Court denies Plaintiffs' motion.

## PROCEDURAL HISTORY

On April 20, 2020, Plaintiffs filed their complaint [Doc. 1], a request that the case be assigned to United States District Judge Judith C. Herrera [Doc. 2], and the subject motion [Doc. 3]. Later that day, the United States entered its appearance on behalf of all Defendants [Doc. 11], and the case was assigned to the undersigned Judge. On April 21, 2020, the Court ordered expedited briefing [Doc. 12]. As part of that Order, the Court instructed Defendants to include their position on whether the case should be assigned to Judge Herrera. On April 24, 2020, Defendants submitted their response [Doc. 20] opposing Plaintiffs' motion. In their response, Defendants alerted the Court that:

> As part of [the United States Immigration and Customs Enforcement's (ICE)] ongoing efforts at Otero to identify and release appropriate vulnerable detainees, Petitioner Betancourt was released from custody on April 21, 2020. Thus, his claim is now moot. Petitioners Fuentes and Mejia were likewise evaluated for potential release but were not granted parole because contrary to their allegations, they do not present documented [Centers for Disease Control and Prevention (CDC)] recognized vulnerabilities for COVID-19 and are flight risks due to their immigration and criminal histories.

Doc. 20 at 2–3 (citations omitted). Plaintiffs filed a notice [Doc. 21] later that same day notifying the Court that they no longer requested an order releasing Plaintiff Betancourt from Otero. Briefing on the motion was completed on April 27, 2020. Doc. 25 (Notice of Completion of Briefing). The court then reviewed the briefing, exhibits, and applicable law and determined that a hearing was not necessary to rule on Plaintiffs' motion.

## REQUEST TO ASSIGN THE CASE TO JUDGE HERRERA

Prior to the undersigned Judge randomly being assigned this case, Plaintiffs requested that Judge Herrera be assigned the matter in their notice of a related case [Doc. 2]. Plaintiffs argued that assigning the case to Judge Herrera would conserve judicial resources because the case involves common questions of law and fact with a case that was previously assigned to her: *Soto v. Governor of New Mexico* (No. 1:20-cv-317-JCH-KK).

"In the District of New Mexico, a judge will, at times, transfer a case to another judge if the other judge has conducted a large amount of work on the case or on a related case. . . . Familiarity with legal issues, however, is not a basis upon which the Court will transfer a case." *Stark-Romero v. Nat'l R.R. Passenger Co.*, 763 F. Supp. 2d 1231, 1274 (D.N.M. Jan. 12, 2011).

In *Soto*, the petitioners requested release from pretrial detention imposed by the State of New Mexico out of fear of contracting COVID-19 while detained. Judge Herrera found that the petition did not "present any federal constitutional or legal basis, fails to state any claim for [28 U.S.C.] § 2241 relief, and must be dismissed." 2020 WL 1853050, at *4 (D.N.M. Apr. 13, 2020). Compared to this case, *Soto* involves different parties, different detention facilities, and does not meaningfully share any common questions of law. The only discernable similarity is that both cases concern requests for release from detention based on COVID-19, and that is not a sufficient reason to reassign this case to Judge Herrera. The Court also notes that the judgment in *Soto* was entered on April 20, 2020, so it cannot be consolidated with this case pursuant to Fed. R. Civ. P. 42. Finally, if Plaintiffs' argument that the instant case is related to the *Soto* case was the legal standard to determine whether one case is related to another case, then this would mean that every case filed in this Court seeking the release of someone because of COVID-19 should be assigned to Judge Herrera. That is not a viable option and is not going to happen in this case. Accordingly,

Plaintiffs' request that the case be assigned to Judge Herrera is **DENIED**.

**FACTUAL BACKGROUND**

## I.     COVID-19

"COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time." Doc. 1-3 (Declaration of Joseph J. Amon, Ph.D. MSPH ("Amon Decl.")) ¶ 6. The Centers for Disease Control and Prevention ("CDC") reports that, as of April 30, 2020, the United States has 1,031,659 COVID-19 cases and 60,057 deaths from it. CDC, Cases of COVID-19 in the United States, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 30, 2020). The New Mexico Department of Health ("NMDH") reports that, as of April 30, 2020, New Mexico has 3,411 COVID-19 cases and 123 deaths from it. NMDH, COVID-19 in New Mexico, https://cvprovider.nmhealth.org/public-dashboard.html    (last visited April 30, 2020). Otero County, however, where the Otero County Processing Center is located and where Plaintiffs are detained, only has 5 COVID-19 cases and no deaths from it. *Id.*

## II.     Plaintiff Michel Fuentes Luis

Plaintiff Michel Fuentes Luis ("Fuentes") is a 33-year-old citizen of Cuba. Doc. 20-1 (Declaration of Deputy Field Officer Director Juan L. Acosta ("Acosta Decl.")) Fuentes ¶ 1. He illegally entered the United States on June 30, 2019. *Id.* ¶ 2. A few days later, United States Border Patrol issued him a notice to appear before an immigration judge and returned him to Mexico under the Migrant Protection Protocols (MPP).[1] *Id.* ¶ 4. On August 19, 2019, he appeared before an

---

[1] "The MPP directs the 'return' of asylum applicants who arrive from Mexico as a substitute to the traditional options of detention and parole. Under the MPP, these applicants are processed for standard removal proceedings, instead of expedited removal. They are then made to wait in Mexico until an immigration judge resolves their asylum claims." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 506 (9th Cir. 2019).

immigration judge in MPP removal proceedings. *Id.* On September 18, 2019, an immigration judge ordered him removed in absentia. *Id.* ¶ 6. He reentered the United States illegally on September 22, 2019. *Id.* ¶ 7. On September 25, 2019, he was convicted of illegal entry under 8 U.S.C. § 1325 in the United States District Court of the Western District of Texas and sentenced to time served. *Id.* ¶ 9. He was then transferred to Otero for removal proceedings. *Id.* ¶ 11. On March 5, 2020, an immigration judge declined to issue him a bond. *Id.* ¶ 14. His next removal proceeding is May 4, 2020. *Id.* ¶ 15.

Plaintiff Fuentes alleges he was diagnosed with asthma at age three and has "used an inhaler ever since." Doc. 1-7 (Declaration of Plaintiff Fuentes ("Fuentes Decl.")) ¶ 5. This medical condition, he claims, makes him "especially vulnerable to severe health complications if [he] get[s] sick with COVID-19." *Id.* ¶ 2. He was recently evaluated for potential release from Otero:

> FUENTES has been evaluated for potential release, but he does not present a CDC recognized vulnerability for COVID-19. He had no documented history of asthma upon arrival and has not been diagnosed with asthma or respiratory difficulties. He did not have an inhaler in his possession when he was taken into [Enforcement and Removal Operations ("ERO")] custody on September 27, [2019]. He has not subsequently requested or been issued an inhaler. He presents a heightened risk of flight given his background.

Acosta Decl., Fuentes ¶ 16. The CDC maintains a webpage where they publish the medical conditions they are aware of that potentially put people at higher risk for severe illness from COVID-19. In terms of asthma, the CDC considers only those with moderate to severe asthma to be at a higher risk. *See* CDC, People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited April 30, 2020) ("People with chronic lung disease or moderate to severe asthma").

## III.    Plaintiff Luis Alfonso Mejia Velasquez

Plaintiff Luis Alfonso Mejia Velasquez ("Mejia") is a 46-year-old citizen of Honduras.

Acosta Decl., Mejia ¶ 1. He illegally entered the United States on November 4, 2003. *Id.* ¶ 2. A month later, an immigration judge ordered him to be removed. *Id.* ¶ 5. He was removed to Honduras on February 9, 2004. *Id.* ¶ 6. On an unknown date, he illegally reentered the United States. *Id.* ¶ 7. On February 14, 2012, he was convicted of resisting arrest with force or violence in the 22nd Judicial District Court of St. Tammany Parish in Covington, Louisiana. *Id.* ¶ 9. His prior removal order was then reinstated, and he was removed for a second time on March 30, 2012. *Id.* ¶¶ 11-13. On January 31, 2020, he illegally reentered the United States for a third time. *Id.* ¶ 14. On March 23, 2020, he was convicted of illegal reentry under 8 U.S.C. § 1326 in the United States District Court of the Western District of Texas and sentenced to time served. *Id.* ¶¶ 16-17. He was then transferred to Otero for removal proceedings. *Id.* ¶ 19.

Plaintiff Mejia alleges he was diagnosed with hypertension and, as a result, experiences "dizziness, frequent headaches, and chest pain almost every night." Doc. 1-9 (Declaration of Plaintiff Mejia ("Mejia Decl.")) ¶¶ 5-7. This medical condition, he claims, makes him "especially vulnerable to severe health complications if [he] get[s] sick with COVID-19." *Id.* ¶ 2. He was recently evaluated for potential release from Otero:

> MEJIA has been evaluated for potential release, but he does not have a CDC-recognized vulnerability for COVID-19 because he is receiving medication for hypertension and his primary care provider has cleared him from daily blood pressure checks. MEJIA presents a risk of danger and a heightened risk of flight given his criminal and immigration backgrounds.

Acosta Decl., Mejia ¶ 21. On the webpage that the CDC uses to publish the known medical conditions that potentially put people at higher risk for severe illness from COVID-19, hypertension is not listed:

> Based on what [the CDC] know[s] now, those at high-risk for severe illness from COVID-19 are:
> ■ People 65 years and older
> ■ People who live in a nursing home or long-term care facility

People of all ages with underlying medical conditions, particularly if not well controlled, including:
- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
  - Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

CDC, People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited April 30, 2020).

## IV.    COVID-19 at the Otero County Processing Center

On April 8, 2020, one detainee at Otero tested positive for COVID-19. Acosta Decl. ¶ 28. That detainee has since been removed from the United States. *Id.* As of April 23, 2020, there is one documented positive COVID-19 case at Otero. *Id.* ¶ 27. The 43 detainees who had known contact with that individual were separated from the general population and are monitored daily for fever and symptoms of respiratory illness. *Id.* ¶¶ 16 and 27.

Since the onset of COVID-19, "ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees." *Id.* ¶ 11. Otero's staff follows "ERO's COVID-19 Pandemic Response Requirements and the CDC's Interim Guidance on Management of [COVID-19] in Correctional and Detention Facilities." *Id.* ¶ 12.

As of April 20, 2020, Otero "is at 60% of its normal capacity." *Id.* ¶ 7. The population percentage at each housing unit is monitored daily to allow for as much social distancing as

practicable. *Id.* Detainees are assigned to beds that are separated by six feet and, when detainees must be assigned to the same bunk bed, they sleep feet-to-head to increase their distance from each other. *Id.* Recreation, meals, and other scheduled activities have also been adjusted to allow for social distancing. *Id.* ¶ 23. To further mitigate the introduction of COVID-19 into Otero, in-person social visitation has been suspended. *Id.* ¶ 26.

Officials at Otero have posted CDC guidance with information on COVID-19 in dormitories and community areas. The posters include information about the symptoms, spread, and prevention of COVID-19. *Id.* ¶ 20. Detainees are provided with hygiene kits that include soap, shampoo, a toothbrush, and toothpaste, and the hygiene kits are replaced at no cost to the detainees. *Id.* ¶ 19. Hand sanitizer is available for the detainees to use, and additional soap dispensers have been placed in the housing units. *Id.* Cleaning crews, both contract staff and volunteer detainee workers, also clean and disinfect the housing units and common areas. *Id.*

To ensure new detainees do not bring COVID-19 into Otero, each new detainee is medically screened and separated for a 14-day medical observation:

> During detention intake, a qualified health care provider assesses each detainee for fever and respiratory illness. Each detainee is asked, in a language they understand, to confirm if they have had close contact with a person with laboratory confirmed COVID-19 in the past 14 days. Each detainee is asked whether they have traveled from or through area(s) with sustained community transmission during the prior two weeks. All new detainee admissions are then assigned to a staggered housing location for 14-day medical observation.

*Id.* ¶ 14. Any asymptomatic detainee with known exposure to a person with confirmed COVID-19 is separated into a cohort with other similarly exposed detainees for the duration of COVID-19's 14-day incubation period. *Id.* ¶ 16. They are monitored daily for fever and symptoms of respiratory illness and are referred to a medical provider for evaluation if they develop symptoms. *Id.* If a detainee tests positive for COVID-19, they are isolated and receive medical treatment. *Id.*

¶ 15. If needed, the detainee will be referred for local hospitalization. *Id.*

The staff at Otero have received guidance on how to detect symptoms of COVID-19 and help prevent its spread. *Id.* ¶ 22. When interacting with detainees, staff members use personal protective equipment, to include N95 respirators, eye protection, and latex gloves. *Id.* Staff members are also encouraged to stay home if they feel ill, and those who have had direct contact with a person testing positive for COVID-19 are asked to self-quarantine for 14 days. *Id.*

## DISCUSSION

"[W]hen a temporary restraining order is sought on notice to the adverse party, it may be treated by the court as a motion for a preliminary injunction." 13 Moore's Federal Practice § 65.31 (2020); *see* Fed. R. Civ. P. 65. Defendants received notice of Plaintiffs' motion for a temporary restraining order and filed a response opposing it. Doc. 11 (Notice of Appearance by the United States on behalf of the Defendants); Doc. 20 (Defendants' Response). The Court, therefore, will treat Plaintiffs' request for a temporary restraining order as a request for a preliminary injunction.

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple–Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019)). To obtain a preliminary injunction, Plaintiffs must establish: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; *and* (4) that the injunction, if issued, will not adversely affect the public interest." *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (*emphasis* added) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Id.* (quoting

*Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1224 (10th Cir. 2008)).

Courts disfavor preliminary injunctions that "exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Mrs. Fields Franchising, LLC*, 941 F.3d at 1232 (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 797). Because Plaintiffs' request for immediate release from Otero meets all three disfavored categories, they face "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors." *Id.*

**I.      Plaintiffs Fail to Establish a Substantial Likelihood of Prevailing on the Merits**

Plaintiffs are seeking relief under 28 U.S.C. § 2241 as a habeas corpus petition and 28 U.S.C. § 1331 as an independent cause of action for injunctive relief under the Fifth Amendment's Due Process Clause. They argue that the Court may order their immediate release under either.

The Court may grant a writ of habeas corpus to someone "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). "The fundamental purpose of a § 2241 habeas proceeding is . . . 'an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811 (10th Cir. 1997) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)). "It is well-settled law that prisoners who wish to challenge only the conditions of their confinement, as opposed to its fact or duration, must do so through civil rights lawsuits filed pursuant to 42 U.S.C. § 1983 or *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)—not through federal habeas proceedings." *Standifer v. Ledezma*, 653 F.3d 1276, 1280 (10th Cir. 2011).

Although Plaintiffs are requesting immediate release, they are not challenging the legality or duration of their detention. At the core of their argument, they contend that the conditions of

their detention at Otero are inadequate to protect them from exposure to COVID-19. For example, Plaintiffs allege that they "are in close quarters on a near constant basis, making it virtually impossible to adhere to social distancing guidelines," "inadequate hygienic and sanitation practices have continued amidst the COVID-19 pandemic," "they are not provided with sufficient cleaning supplies or hand soap," and that the "guards do not wear masks or gloves." Doc. 1 (Complaint) at 8–10. Plaintiffs do not allege that the fact that they are detained for removal proceedings or that the length of their detention is illegal. Accordingly, the Court finds that Plaintiffs are challenging the conditions of their detention, as opposed to its fact or duration, which is not appropriate under 28 U.S.C. § 2241. *See Standifer*, 653 F.3d at 1280; *see also Sacal-Micha v. Longoria*, 2020 WL 1518861, at *4 (S.D. Tex. Mar. 27, 2020) (explaining that 28 U.S.C. § 2241 is used to challenge the fact or duration of confinement, not conditions of confinement, and that "at the core of his allegations [plaintiff] challenges the conditions of his confinement").

Federal immigration detention is a form of civil detention that must comply with the Fifth Amendment's Due Process Clause. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). To evaluate the constitutionality of pretrial detention under the Fifth Amendment, the Court must determine whether the conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In the absence of an expressed intent to punish, Plaintiffs can prevail by showing that the conditions are not "rationally related to a legitimate nonpunitive governmental purpose" or that the conditions "appear excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (quoting *Bell*, 441 U.S. at 561).[2]

---

[2] The parties seem to treat Plaintiffs' claims, in part, as a denial of medical care. Even if Plaintiffs' claims were treated as a denial of medical care, the analysis and result would be the same. In *Colbruno v. Kessler*, a case Plaintiffs cited, the Tenth Circuit explained that "when a 'plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment[,] we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities' to evaluate claims of mistreatment." 928 F.3d 1155, 1162 (10th Cir. 2019) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010)).

Plaintiffs do not allege that Defendants have an expressed intent to punish. Plaintiffs argue that "[k]eeping medically-vulnerable people detained in such close proximity to one another and without testing or screening or the sanitation or protective equipment necessary to combat the spread of [COVID-19] is 'not rationally related to a legitimate governmental objective' and thus constitutes illegitimate punishment in violation of Plaintiffs' due process rights." Doc. 3 at 18–19 (citation omitted). Plaintiffs' argument relies on two unproven factual premises: that they have medical conditions that put them at a higher risk of serious illness or death should they contract COVID-19 and that there are no adequate measures that can ensure they avoid exposure to COVID-19 while detained at Otero. Each is discussed in turn.

### A.  Plaintiffs' Alleged Medical Conditions

Plaintiffs have failed to show that Plaintiff Fuentes is medically vulnerable to COVID-19. Plaintiff Fuentes alleges he was diagnosed with asthma at age three and has "used an inhaler ever since." Fuentes Decl. ¶ 5. This medical condition, he claims, makes him "especially vulnerable to severe health complications if [he] get[s] sick with COVID-19." *Id.* ¶ 2. Plaintiff Fuentes, however, did not have an inhaler in his possession when taken into custody and has not required any treatment for asthma or experienced any respiratory difficulties in the seven months he has been detained. Acosta Decl., Fuentes ¶ 16. Plaintiff Fuentes was also recently evaluated for potential release and was found to "not present a CDC recognized vulnerability for COVID-19." *Id.* Under CDC guidelines, only people with moderate or severe asthma are identified as potentially at a higher risk for severe illness from COVID-19. *See* CDC, People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited April 30, 2020).

The medical expert declarations Plaintiffs submitted concerning Plaintiff Fuentes' alleged

asthma condition have minimal probative value because they appear to be based solely on the claims made by Plaintiff Fuentes in his declaration without any independent verification through medical documents or examination. *See* Amon Decl. ¶ 12 ("According to his declaration, [Plaintiff Fuentes] has asthma. This condition puts him at high risk for severe illness and death from COVID-19."); *see* Doc. 1-5 (Declaration of Norton Kalishman, MD ("Kalishman Decl.")) ¶¶ 3 and 23 ("I have reviewed the declaration[] of . . . Michel Fuentes Luis" and he "has been diagnosed with asthma that has required the use of an inhaler since he was three. This condition puts him at high risk of serious illness or death if he is infected with COVID-19."). Plaintiff Fuentes' exaggeration concerning his alleged asthma condition is not surprising when considering he also stated in his declaration, "I have no criminal convictions in the U.S.," when in fact he does: "On September 25, 2019, the U.S. District Court of the Western District of Texas in Pecos convicted FUENTES of illegal entry." Fuentes Decl. ¶ 8; Acosta Decl., Fuentes ¶ 9. The Court finds that Plaintiffs have failed to show that Plaintiff Fuentes is medically vulnerable to COVID-19.

Plaintiffs have also failed to show that Plaintiff Mejia is medically vulnerable to COVID-19. Plaintiff Mejia alleges he was diagnosed with hypertension and, as a result, experiences "dizziness, frequent headaches, and chest pain almost every night." Mejia Decl. ¶¶ 5–7. This medical condition, he claims, makes him "especially vulnerable to severe health complications if [he] get[s] sick with COVID-19." *Id.* ¶ 2. Plaintiff Mejia, however, is receiving medication for hypertension while detained at Otero and his primary care provider has cleared him from daily blood pressure checks. Acosta Decl., Mejia ¶ 21. Plaintiff Mejia was also recently evaluated for potential release and was found to "not have a CDC-recognized vulnerability for COVID-19." *Id.* The CDC does not list hypertension on the webpage they use to publish the medical conditions that potentially put people at higher risk for severe illness from COVID-19. *See* CDC, People Who

13

Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited April 30, 2020).

The medical expert declarations Plaintiffs submitted concerning Plaintiff Mejia's hypertension also have minimal probative value because they also appear to be based solely on the claims made by Plaintiff Mejia in his declaration without any independent verification through medical documents or examination. *See* Amon Decl. ¶ 13 ("According to his declaration, [Plaintiff Mejia] appears to have poorly controlled hypertension with recurring symptoms of chest pain, difficulty breathing, headaches and dizziness." Plaintiff Mejia's "condition and potentially related symptoms indicate he is likely at high risk for severe illness and death from COVID-19."); *see* Kalishman Decl. ¶¶ 3 and 23 ("I have reviewed the declaration[] of . . . Louis Alfonzo Mejia Velasquez" and he "has been diagnosed with hypertension that has required the use of medication and left him hospitalized on three occasions. This condition puts him at high risk of serious illness or death if he is infected with COVID-19.").

Plaintiffs argue in their reply that other Courts have found hypertension to be a condition that puts people at a higher risk of serious illness or death should they contract COVID-19. Doc. 24 at 8–9. However, of the three cases Plaintiffs cite, each concern plaintiffs with multiple medical conditions and risk factors, not just hypertension. For example, in *Essien v. Barr*, 2020 WL 1974761 (D. Colo. Apr. 24, 2020), the Court explains that the plaintiff, in addition to having hypertension, has six other medical conditions and risk factors for COVID-19. The cases Plaintiffs cite do no stand for the proposition that if someone has hypertension, that condition alone puts them at greater risk of serious illness or death should they contract COVID-19. The Court finds that Plaintiffs have failed to show that Plaintiff Mejia is medically vulnerable to COVID-19.

### B. Otero County Processing Center's COVID-19 Measures

Plaintiffs have also failed to show that there are no adequate measures that can ensure they avoid exposure to COVID-19 while detained at Otero. As discussed in detail in the factual background section of this Memorandum Opinion and Order, Otero has taken numerous measures, following ERO's COVID-19 Pandemic Response Requirements and the CDC's Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, to prevent its detainees from exposure to COVID-19. Additionally, the allegations raised by Plaintiffs regarding the conditions at Otero are directly contrary to the evidence provided by Deputy Field Office Director Acosta. For example, Plaintiffs allege that detainees "lack sufficient cleaning supplies and hand soap." Fuentes Decl. ¶ 13; Mejia Decl. ¶ 12 ("I am very worried about the sanitation in this facility. We only have shampoo to wash our hands and bodies"). But the more credible evidence before the Court demonstrates that Plaintiffs' representations are not accurate:

> At each detention facility, upon admission, all detainees are provided a no-cost hygiene kit which includes soap and shampoo (can be an all-in-one product) a toothbrush and toothpaste. Hygiene kits are automatically refreshed at no cost or when a detainee requests one. Hand sanitizers are available for use for the [Otero County Processing Center] detained population. Additional soap dispensers have been placed in the [Otero County Processing Center] housing units to reinforce the proper hand washing protocols. Cleaning crews, both contract staff and volunteer detainee workers, are using the proper disinfection chemicals when performing housing unit and common area cleaning.

Acosta Decl. ¶ 19. Plaintiffs also allege crowded conditions, but Otero "is at 60% of its normal capacity," and officials monitor the housing unit populations daily to allow for social distancing as much practicable *Id.* ¶ 7. Recreation, meals, and other scheduled activities have also been adjusted to allow for social distancing. *Id.* ¶ 23. Detainees who present COVID-19 symptoms are referred to a medical provider for testing and separated from others. *Id.* ¶ 15. Confirmed COVID-19 cases are isolated and treated. *Id.* Asymptomatic detainees with known exposure to a confirmed

case are placed in cohorts and monitored daily for 14 days. *Id.* ¶ 16. And new detainees are screened and separated from the general population for 14 days upon arrival. *Id.* ¶ 14.

The expert declarations Plaintiffs submitted do not assist them in showing that there are no adequate measures that can ensure they avoid exposure to COVID-19 while detained at Otero. Dr. Amon and Dr. Kalishman's discussion on the conditions at Otero appear to be based solely on the descriptions provided in Plaintiffs' declarations without any independent verification. *See* Amon Decl. ¶ 36 ("Based upon the declarations I reviewed, I have identified the following vectors of COVID-19 infection at Otero County Processing Center."); *see* Kalishman Decl. ¶ 21 ("In the congregate setting, described in Petitioners' declarations, large numbers of people must share eating, hygiene, and sleeping facilities, leaving them vulnerable to transmission of this COVID-19."). Dr. Schriro's declaration provides only a generalized discussion of conditions at ICE facilities without providing any specific information addressing the current conditions at Otero. *See* Doc. 1-6 (Declaration of Dr. Dora Schriro). And Ms. Rucker's affidavit provides her observations from a visit to Otero on January 21, 2020, months before the COVID-19 outbreak had taken hold and Otero's prevention measures were put in place. *See* Doc. 1-10 (Affidavit of Nia Rucker). The Court finds that Plaintiffs have failed to show that there are no adequate measures to ensure they avoid exposure to COVID-19 while detained at Otero.

The Supreme Court has consistently held that detaining aliens to prevent them from absconding and ensuring that they appear for removal proceedings is a legitimate governmental purpose. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas*, 533 U.S. at 690–91. Plaintiffs have not shown that their detention at Otero is not rationally related to that legitimate governmental purpose or is excessive in relation to that purpose because they have failed to demonstrate that they have medical conditions that put

them at a higher risk of serious illness or death should they contract COVID-19 and that there are no adequate measures that can ensure they avoid exposure to COVID-19 while detained at Otero. *See Kingsley*, 135 S. Ct. at 2473 (2015) (quoting *Bell*, 441 U.S. at 561). Accordingly, the Court finds that Plaintiffs have not shown a substantial likelihood of prevailing on the merits.

## II.      Plaintiffs Fail to show Irreparable Harm Unless the Injunction is Issued

Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs assert that they will suffer irreparable harm if they are not immediately released from Otero because they have medical conditions that put them at a higher risk of serious illness or death should they contract COVID-19, there are no adequate measures that can ensure they avoid exposure to COVID-19 at Otero, and Defendants have violated their constitutional rights by continuing to detain them despite being ill equipped to adequately protect them from COVID-19. Doc. 3 at 25–26. As discussed in detail in the previous section of this Memorandum Opinion and Order, these assertions are without merit. Plaintiffs have not shown that they have medical conditions that put them at a higher risk of serious illness or death should they contract COVID-19 or that the safeguards and precautions in place at Otero are inadequate to prevent them from being exposed to COVID-19.

In essence, Plaintiffs are asking the Court to order their immediate release from Otero based on the possibility that they may suffer irreparable harm from COVID-19 should they contract it while detained there. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Accordingly, the Court finds that Plaintiffs have not shown that they will suffer irreparable harm unless the injunction is issued.

Even if the Court were to order Plaintiffs' immediate release, the Court cannot make the finding that they would not face the risk of contracting COVID-19 outside of Otero, when comparing the United States 1,031,659 COVID-19 cases to Otero County's 5 COVID-19 cases. *Compare* CDC, Cases of COVID-19 in the United States, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 30, 2020), *with* NMDH, COVID-19 in New Mexico, https://cvprovider.nmhealth.org/public-dashboard.html  (last visited April 30, 2020).

III. **Plaintiffs Fail to show that their Threatened Injury Outweighs the Harm that the Preliminary Injunction may cause the United States**

Plaintiffs argue that their threatened injury outweighs any harm the injunction would cause the United States because they will suffer irreparable harm from COVID-19 if not released from Otero and the harm to the United States is administrative because there are alternatives to detention such as release on conditions and bond. Doc. 3 at 27. Their argument is premised on having established that they will suffer irreparable harm from COVID-19 if not released. As explained in the previous section of this Memorandum Opinion and Order, Plaintiffs have not established irreparable harm. Accordingly, the Court finds that Plaintiffs have not shown that their threatened injury outweighs the harm that the injunction may cause the United States.

IV. **Plaintiffs Fail to show that the Injunction, if issued, would Not Adversely Affect the Public Interest**

Plaintiffs argue that the injunction would benefit the public interest because they claim that their release from Otero would decrease the likelihood that they will contract COVID-19 and take up valuable medical resources when being treated. *Id.* at 28. In making this argument, Plaintiffs incorrectly assume they are more vulnerable to COVID-19 at Otero and disregard their immigration histories and the fact that the "Supreme Court has recognized that the public interest

18

in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (collecting cases).

Plaintiff Fuentes has illegally entered the United States two times. Acosta Decl., Fuentes ¶¶ 2 and 7. Plaintiff Mejia has illegally entered and reentered the United States three times. *Id.*, Mejia ¶¶ 2, 7 and 14. Based on this prior conduct by Plaintiffs, they have demonstrated that they have no respect for the United States' immigration laws. Plaintiff Mejia also presents a risk of danger as he has a conviction for resisting arrest with force or violence. *Id.* ¶ 9. The public interest in enforcement of immigration laws is significant and so is the public interest in being protected from those who present a risk of danger. Releasing Plaintiffs would be contrary to public interest. Accordingly, the Court finds that Plaintiffs have failed to show that the injunction would not adversely affect the public interest.

## CONCLUSION

A preliminary injunction of the type requested by Plaintiffs is an extraordinary remedy, and to obtain one Plaintiffs must show a substantial likelihood of prevailing on the merits; irreparable harm unless the injunction is issued; that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and that the injunction, if issued, will not adversely affect the public interest. Plaintiffs have not met their burden in establishing any of these factors. For the reasons explained in this Memorandum Opinion and Order, Plaintiffs' Motion for a Temporary Restraining Order [Doc. 3] is **DENIED**.

**IT IS SO ORDERED**.

_____
**WILLIAM P. JOHNSON**
**CHIEF UNITED STATES DISTRICT JUDGE**